UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHILLE DIVISION

| | |
|---|---|
| LISA SMELSER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:14-02383 |
| ) | Judge Aleta A. Trauger |
| MIRACLE CHRYSLER PLYMOUTH ) | |
| DODGE, INC., ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM

Pending before the court is a Motion for Summary Judgment (Docket No. 21) filed by the defendant Miracle Chrysler Plymouth Dodge, Inc. ("Miracle"), to which the plaintiff Lisa Smelser has filed a Response (Docket No. 29), and Miracle has filed a Reply (Docket No. 28). For the reasons discussed herein, the motion will be granted.

## BACKGROUND & PROCEDURAL HISTORY[1]

**I.    The Parties**

Miracle is an independent, family-owned automobile dealer with one location in Gallatin, Tennessee. Ms. Smelser was initially hired as a Service Writer for Miracle and, in January of 2005, was promoted by Tim Galvin, Miracle's General Manager, to the position of Service Manager. Miracle has only one Service Department and, during her time as Service Manager, Ms. Smelser was the only person holding this position at Miracle; she was, accordingly, the

---

[1] For purposes of summary judgment, the facts contained in this section are either undisputed facts drawn from Ms. Smelser's Response to Miracle's Statement of Undisputed Material Facts (Docket No. 27) or admissions from Ms. Smelser's own deposition testimony and responses to discovery requests (Docket Nos. 21-4, 21-5, 21-6).

1

highest ranking and highest paid Service Department employee, effectively running the department with no one else sharing her managerial duties.

## II. **Ms. Smelser's Reports of the Sexual Harassment of Other Employees**

In March or April of 2011, Ms. Smelser reported to Kathleen Barrett, who was Miracle's Controller and handled all human resources matters, that Ms. Smelser had heard from another employee, Jessica Smith, that Ms. Smith had been receiving unwanted text messages of a sexual nature from Tim Galvin. Ms. Barrett subsequently spoke with Ms. Smith and Tim Galvin separately about this issue, and Ms. Smith indicated that she did not want to file a harassment complaint but also did not want to receive any more text messages from Tim Galvin. Ms. Barrett told Tim Galvin that Ms. Smith did not want to receive text messages from him and that he should not send text messages to her. After that, the text messages ceased, and Ms. Smith never "expressed any objection with the manner in which the matter was resolved" (Docket No. 27 ¶ 35) or filed a complaint of harassment against Tim Galvin. Later in 2011, Ms. Smith left Miracle and moved to a position at a different dealership.

On the Friday before Memorial Day in 2012, Ms. Smelser reported to Jim Galvin, Sr., (who is Tim Galvin's father and the owner of Miracle) that yet another employee, Terri Appleton, had complained of sexually inappropriate conduct by Tim Galvin. This conduct allegedly occurred during an incident – the timing of which is unclear from the record – in which Tim Galvin asked Ms. Appleton to pick him up from a local bar after work hours. Ms. Smelser did not witness this alleged incident but was told of it by Ms. Appleton shortly before she reported it to Jim Galvin, Sr. The reason Ms. Smelser brought this complaint to Jim Galvin, Sr., instead of Ms. Barrett, is that Ms. Barrett was hospitalized that weekend. Following Ms. Smelser's report, Jim Galvin, Sr. reprimanded Tim Galvin, telling him that any similar future

allegations would result in his termination. There was a subsequent investigation by Miracle, but it did not resolve what happened between Tim Galvin and Ms. Appleton. From Ms. Smelser's testimony and Miracle's briefing, it appears that Ms. Appleton subsequently filed a charge with the Equal Opportunity Employment Commission ("EEOC") and has a currently pending lawsuit based on her allegations of sexual harassment. (See Docket No. 21-4 (January 8, 2016 Deposition of Ms. Smelser ("2016 Smelser Dep.")), 117:10-118:10; Docket No. 22, p. 7, n. 12.)

## III. Allegations of Retaliation

The instant action arises from Ms. Smelser's allegations that, subsequent to her reporting Ms. Appleton's complaints to Jim Galvin, Sr. on Memorial Day weekend of 2012, she was retaliated against by Tim Galvin and Ms. Barrett. In her deposition testimony, Ms. Smelser makes the vague allegation that, after this incident, she was mentally "beat up at work," meaning that she was mentally and verbally abused by Ms. Barrett and Tim Galvin. (Docket No. 21-4 (2016 Smelser Dep.), 86:2-88:6.) According to Ms. Smelser, this made her work conditions "miserable" and "unbearable" and caused her to cry at work, feel angry and stressed, and, ultimately, develop Crohn's disease. (*Id*.) With respect to specific incidents of retaliatory harassment, however, Ms. Smelser concedes, in early deposition testimony, that the "sum total of what [she] would consider to be the verbal abuse" she suffered was confined to the following two incidents: 1) Ms. Barrett telling Ms. Smelser, on the Tuesday after Memorial Day, that Ms. Smelser really should have come to her instead of bringing Ms. Appleton's complaints to Jim Galvin, Sr.; and 2) Tim Galvin telling Ms. Smelser, after a manager's meeting at an unspecified time after the incident, that he would have to "make other arrangements" if Ms. Smelser continued to talk about Ms. Appleton's allegations with Ms. Appleton and other employees at work. (Docket No. 21-5 (May 28, 2014 Deposition of Ms. Smelser ("2014 Smelser Dep.")),

3

113:13-25.) Similarly, in a response to an interrogatory from Miracle asking Ms. Smelser to identify "how and by whom [she] was bullied," Ms. Smelser stated only the following: "Tim Galvin repeatedly told me his managers should have his back.  If I didn't he would have to make other arrangements with me.  He lied multiple times about work-related issues.  He did this in an intimidating way."  (Docket No. 21-6 ¶ 16.)

In subsequent deposition testimony, Ms. Smelser elaborates on these incidents and raises some additional allegations about the basis for her claim of retaliatory harassment.  With regard to Ms. Barrett, Ms. Smelser admits that the incident on the Tuesday after Memorial Day of 2012 involved nothing more than Ms. Barrett's being upset that Ms. Smelser did not come to her with Ms. Appleton's complaints and saying something to the effect of "there's no reason you should not come to me."  (Docket No. 21-4 (2016 Smelser Dep.), 105:12-110:18.)  Ms. Smelser also avers that Ms. Barrett likes to be in control and try to fix things and that she is known to sometimes lie and keep things from Jim Galvin, Sr.  (*Id*.)  Ms. Smelser concedes, however, that the conversation between her and Ms. Barrett led to no written reprimands, no negative employee evaluations, and no reduction in Ms. Smelser's hours, benefits, or salary.  (*Id*. at 99:16-100:25.)  In fact, Ms. Smelser concedes that nothing about the terms of her employment changed after the meeting, other than that Ms. Barrett thereafter seemed generally harsh with Ms. Smelser when discussing matters at work.  (*Id*.)  Specifically, Ms. Smelser avers that, after the Memorial Day 2012 incident, Ms. Barrett made Ms. Smelser feel belittled and was "not a nice person," while, before that, Ms. Barrett had always been nice to her.  (*Id*. at 94:15-96:23.)  Ms. Smelser does not, however, provide any concrete examples of Ms. Barrett's behavior beyond these general allegations about Ms. Barrett's tone and demeanor.  Ms. Smelser also concedes that Ms. Barrett never cursed at her or called her names.  (*Id*. at 105:12-110:18.)  Finally, it is

4

undisputed that *at no point in time* did Ms. Barrett issue Ms. Smelser a written reprimand, reduce the number of hours she worked, or reduce her benefits or salary as a result of her reports of Tim Galvin's alleged harassment of other employees.

Ms. Smelser cites one additional incident from 2011 (before the report to Jim Galvin, Sr. on Memorial Day weekend 2012), in which Ms. Barrett orally reprimanded Ms. Smelser. (Docket No. 21-4 (2016 Smelser Dep.) at 88:7-18.) This incident took place at an employee cookout, where Tim Galvin allegedly showed up intoxicated, and involved Ms. Barrett's reprimanding Ms. Smelser for not calling Ms. Barrett to pick up Tim Galvin and for allowing him to be drunk and make a fool of himself. (*Id*.) Ms. Smelser avers that she told Ms. Barrett that it was not her job to look after Tim Galvin, because he "was a grown man, and he should know better." (*Id*.) Ms. Smelser also avers that she called Ms. Barrett an enabler and that she had no problem standing up to Ms. Barrett in this way. (*Id*. at 92:9-25.) Finally, Ms. Smelser admits that this incident led to no changes in the terms of her employment and no disciplinary action. (*Id*.)

With respect to allegations of retaliatory harassment by Tim Galvin, Ms. Smelser admits that he never cursed at her or called her inappropriate names. While Ms. Smelser refers in her deposition, and in her interrogatory response cited above, to Tim Galvin's making "threats" about having to "make other arrangements" if she continued to speak with Ms. Appleton, she does not identify any allegedly threatening remark he made beyond the single incident after a manager's meeting mentioned above. (Docket No. 21-4 (2016 Smelser Dep.) at 111:1-113:14.) Elsewhere in her testimony, Ms. Smelser also appears to admit that the manager's meeting was the only occasion on which Tim Galvin made such a remark, and she elaborates that the context of this conversation pertained to Ms. Appleton's having broken the confidentiality of the EEOC

5

charge and mediation by discussing them with Ms. Smelser and other employees. (*Id*. at 114:20-119:16; Docket No. 21-5 (2014 Smelser Dep.), 106:16-112:7.) Ms. Smelser further elaborates that Tim Galvin told her to no longer talk to Ms. Appleton or have Ms. Appleton come into the service department and that "he would have to make other arrangements if [Ms. Smelser] continued to talk to her." (Docket NO. 21-4 (2016 Smelser Dep.), 111:16-113:14.) Ms. Smelser admits, however, that she did continue to talk to Ms. Appleton after this time, by visiting her in the department in which Ms. Appleton worked. (*Id*.) Further, there is no evidence in the record to show that Ms. Smelser was ever formally disciplined for speaking with Ms. Appleton, that there were any repercussions to the terms of her employment, or that there were any consequences at all beyond Mr. Galvin's comment at the manager's meeting and his telling Ms. Smelser between ten and twelve times on other occasions that she should "have his back." (*Id*.)

Ms. Smelser also avers that Tim Galvin treated her differently than he did other managers because he did not just sit and chat with her and was not chummy with her like he was with the others but, instead, made her feel isolated. (Docket No. 21-4 (2016 Smelser Dep.), 114:14-116:21.) Ms. Smelser avers that this unfriendly treatment began only *after* she reported Ms. Appleton's allegations to Jim Galvin, Sr., and was part of the reason she left Miracle in September of 2013. (*Id*.) She asserts that, because of this behavior, she felt like her job was on the line and that Tim Galvin might fire her at any time, and she became depressed as a result. (*Id*.) She concedes, however, that Tim Galvin never reprimanded her or said anything that could be understood as a threat to fire he,r other than that one incident when he said he would have to "make other arrangements." (*Id*.) Ms. Smelser also asserts that she was ashamed to work for Tim Galvin, saying that it was embarrassing to go to places around town and have people

6

comment on her boss's reputation for being an alcoholic and for harassing women. (*Id*. at 90:8-21.)

In addition, Ms. Smelser asserts that, after Memorial Day of 2012, she received one other report of harassment by Tim Galvin, this time from a Miracle employee named Jessica Williams, but that she never reported this complaint to anyone because of the response she had received to her last report. (Docket No. 21-4 (2016 Smelser Dep.) at 79:24-81:16.) She specifically avers that she was deterred from reporting this complaint by the fact that, on the Tuesday after Memorial Day, Tim Galvin called her into his office and said he knew that she had reported Ms. Appleton's complaints to Jim Galvin, Sr. and that she "should have come to him" instead of his father, because he was her boss and she "should have had his back." (*Id*.) She further asserts that Tim Galvin said to her, in that same meeting, "I was drunk. When I get drunk, I get blind. I don't remember things. But I don't want her. Look at her. I don't want her" in reference to Terri Appleton.

Regardless of whether this conduct and commentary by Tim Galvin was inappropriate, Ms. Smelser does not dispute that she was never sexually harassed by Tim Galvin.

### IV. **Ms. Smelser's Transfer Request and Resignation**

In early 2013, Ms. Smelser requested a transfer from the Service Manager position back to a position as a Service Writer. She admits that, while she no longer wanted to be a Service Manager at Miracle at that time, she planned to remain employed at Miracle in the Service Writer position after she was transferred. (Docket No. 21-4 (2016 Smelser Dep.) at 113:19-114:13.) It is undisputed that Ms. Smelser voluntarily initiated this transfer request, and there is no evidence in the record that Miracle asked, or directly encouraged, her to do so. It is further undisputed that Ms. Smelser's stated reason for requesting the transfer was because she preferred

the position of Service Writer, and she wanted to have more interaction with customers and fewer management responsibilities. Ms. Smelser now asserts, however, that an additional reason she sought to change positions was that she was "tired of the abuse she received from Tim Galvin while she was the Service Manager." (Docket No. 27 ¶ 9.) The record, however, contains no evidence of abuse or harassment – other than the incidents described above – underlying Ms. Smelser's decision to transfer to the Service Writer position. Nor is there any evidence in the record linking any of the alleged mistreatment by Tim Galvin and Ms. Barrett specifically to Ms. Smelser's role as Service Manager or suggesting it that would be mitigated by a transfer to the Service Writer position. With respect to the abuse that she alleges led to her decision to request a transfer, Ms. Smelser cites only Tim Galvin's repeatedly telling her, if he did not like something during a manager's meeting, "I'll find a manager who has my back" and asking her not to speak with other employees about Ms. Appleton's allegations of sexual harassment. (Docket No. 21-4 (2016 Smelser Dep.) at 19:5-21:1.)

It appears from the record that, in response to her request, Miracle agreed to transfer Ms. Smelser to the Service Writer position, but she remained in the Service Manager Role while Miracle began the process of hiring her replacement. Ms. Smelser admits that she had intended to remain at Miracle for the foreseeable future until she was "lied to again." This apparently refers to her allegation that, in September of 2013, she learned that Tim Galvin had hired a new Service Manager without involving Ms. Smelser in the interview process, even though he had told her that she would be involved. (Docket No. 21-4 (2016 Smelser Dep.), 23:20-26:4.) She refers to this incident of being excluded from the interview process as the "last straw of abuse" that made her decide to leave Miracle. (*Id*. at 24:16-19.) She admits, however, that, "had she been involved with the interview process, [she] intended to remain with Miracle" (Docket No.

8

27, p. 66) and further states that, if it had not been for this incident involving her exclusion from the interview process, she would possibly still even now be working for Miracle (Docket No. 21-5 (2014 Smelser Dep), 15:13-18). In late September of 2013, before the transfer took effect, Ms. Smelser resigned from Miracle and, in early October, she began working at another dealership. There is no evidence in the record that anyone at Miracle asked or expressly encouraged Ms. Smelser to resign. It is further undisputed that, at no point in 2012 or 2013, did Ms. Smelser's job title, benefits, or salary change for the worse.

Finally, it is undisputed that, in 2013, Ms. Smelser asked for – and received – an increase in her compensation and that, at the time this occurred, Tim Galvin approved the raise because he was trying to persuade Ms. Smelser to remain at Miracle. Ms. Smelser had spoken to Tim Galvin about the fact that – as she had recently learned – other managers working for different dealerships were making more money than she was. Ms. Smelser was given a raise and, during the last four to five months of her employment, Ms. Smelser earned an additional $750 per month.[2] (Docket No. 21-4 (2016 Smelser Dep.), 28:3-29:14.) Ms. Smelser admits that Mr. Galvin said, "Don't leave, I can - let me see if I can work out another compensation plan." (*Id.*) Ms. Smelser also admits that Tim Galvin told her she was good at her job, whether as a manager or a Service Writer, and offered different things to convince her to stay (though she did not believe him because, she asserts, he had lied in the past). (Docket No. 21-5 (2014 Smelser Dep.), 19:1-18.) Ms. Smelser's accounts of past lies by Tim Galvin include only that he repeatedly told her that he was going to take her on a business trip to meet with other service

---

[2] Ms. Smelser alleges in the Complaint, though there is no evidence in the record, that the other managers she met at this meeting were all male, and she implies that she was earning less than they were because she was a woman. (Docket No. 1, ¶)

9

managers but never did. (*Id*. at 114:22-117:24.) Ms. Smelser also admits that Ms. Barrett asked her to stay at Miracle (Docket No. 21-4 (2016 Smelser Dep.), 27:3-8)

V.     **The Lawsuit**

On December 22, 2014, Ms. Smelser initiated this action against Miracle. (Docket No. 1.) The Complaint raises claims for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.[3]

On January 29, 2016, Miracle filed a Motion for Summary Judgement, along with a Statement of Undisputed Material Facts, several exhibits, and a Memorandum in Support. (Docket Nos. 21, 22.) On February 25, 2016, Ms. Smelser filed a Response in opposition (Docket No. 29),[4] along with a Response to Miracle's Statement of Unidisputed Material Facts and supporting exhibits (Docket No. 27). On March, 4, 2016, Miracle filed a Reply. (Docket No. 28.)

## LEGAL STANDARD

---

[3] The Complaint purports to bring *two* separate claims, one under Title VII, and one under the amendments to Title VII codified in the Civil Rights Act of 1991. As the parties both acknowledge, however, this is really just one claim under Title VII, which incorporates the 1991 amendments. *See Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Section 1981a speaks to the availability of punitive damages for Title VII violations that are accompanied by malice of reckless indifference (*Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1082 (6th Cir. 1999)), but the court need not reach this analysis where the basic elements of the claim are not met.

[4] On February 25, 2016, Ms. Smelser filed her Response as Docket No. 26 and, at the same time, served Miracle with the Response. In its Reply, Miracle refers to the Response as Docket No. 26. For unknown reasons, however, Docket No. 26 was deleted from the electronic filing system and, at the court's request, Ms. Smelser refiled the Response on March 17, 2016 as Docket No. 29.

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

In the Complaint, Ms. Smelser broadly and vaguely asserts a claim for violation of Title VII, without clarifying her precise theories of liability. The court begins by noting what claims

11

are not at issue in this case. Despite references in the Complaint to men in similar positions earning more money than she did, Ms. Smelser clarifies in her Response to Miracle's Statement of Undisputed Facts that she "did not assert a claim for wage discrimination in her Complaint." (Docket No. 27, p. 4, n.4.) Indeed, the facts show that the male workers to whom Ms. Smelser compared herself in the Complaint did not work for Miracle but for entirely separate dealerships. Moreover, upon bringing this fact to the attention of Tim Galvin, Ms. Smelser received a raise. Therefore, there is no claim for wage discrimination based on gender at issue in this case. Similarly, Ms. Smesler states in her Response to Miracle's Statement of Undisputed Material Facts that any reference in the Complaint to her "being subjected to sexual harassment . . . was erroneous and that claim is conceded." (*Id*. at p. 7, n. 3.) Indeed, there can be no claim here for sexual harassment, as Ms. Smelser has additionally conceded that Tim Galvin never sexually harassed her.

The record and the briefing clarifies that Ms. Smelser's only claim is one for retaliation for her reporting of Ms. Appleton's allegations, which Ms. Smelser pursues under two distinct legal theories. The first theory is that the retaliation took the form of a hostile work environment, and the second theory is that Ms. Smelser was constructively discharged from Miracle in retaliation for her reports. In order to establish a claim for retaliation under either theory, Ms. Smelser must show that she engaged in protected activity under Title VII and that the retaliation she suffered – whether in the form of a hostile work environment or an adverse employment action – was causally connected to the protected activity.

> To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between

> the plaintiff's protected activity and the adverse employment action. . . . In determining whether there is a causal relationship between a plaintiff's protected activity and an alleged retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action.

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516-17 (6th Cir. 2009).

Even assuming that Ms. Smelser's reporting of the alleged harassment of fellow employees by Tim Galvin is protected activity under Title VII, and noting that it is undisputed that Miracle knew of these reports, the court finds that Ms. Smelser still cannot meet her burden of establishing a *prima facie* case of retaliation. The facts in the record – even taken in the light most favorable to Ms. Smelser – simply do not support a showing of either a hostile work environment or an adverse employment action, let alone a causal connection between Ms. Smelser's reporting and either of these outcomes.

**I.     Hostile Work Environment**

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Determining whether an environment is hostile or abusive requires "looking at all the circumstances" and considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or, a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance." *Id*. at 23. The conduct must be so severe or pervasive that an *objective* reasonable person would find it abusive in addition to the plaintiff subjectively perceiving it as such. *Id*. at 21; *Barrett*, 556 F.3d at 514. The federal courts are "generally not in

the business of refereeing . . . common workplace conflicts." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) (citing *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (federal law "does not guarantee a utopian workplace or even a pleasant one")).

Ms. Smelser has simply not put forth evidence sufficient to show that she suffered severe or pervasive mistreatment that would constitute a hostile work environment. Being told by her manager that she should "have his back," being asked to stop discussing another employee's pending EEOC charge at work, and being told by someone in human resources that it would be preferable for her to bring complaints to that person instead of the company's owner are not the kinds of events that a reasonable person could find objectively abusive, regardless of the tone in which these comments were delivered. Nor are the facts that Ms. Smelser was generally embarrassed by her employer's personal reputation, felt intimated or isolated by her superiors, or experienced coldness, harshness, or lack of friendliness grounds for finding severe or pervasive mistreatment. *See, e.g. Willey v. Slater*, 20 F. App'x 404 (6th Cir. 2001) (holding that evidence that an employer often ignored the plaintiff, told him to report to his supervisor first before filing a complaint, treated him in an openly negative and hostile manner, and subjected him to heightened scrutiny, among other things, was not sufficient to support a retaliation claim based on hostile work environment). The fact that Ms. Smelser may have subjectively felt that this conduct was abusive is not sufficient to meet the objective factor that is necessary to establish this claim. The conflict regarding the interview of Ms. Smelser's replacement and Ms. Smelser's dissatisfaction with Tim Galvin's failure to follow through on promises is nothing more than a common workplace conflict that does not fall under the purview of a Title VII hostile work environment claim.

Accordingly, Ms. Smelser's retaliation claim cannot, as a matter of law, proceed pursuant to a theory of hostile work environment.

## II. Constructive Discharge/Adverse Employment Action

Nor can Ms. Smelser's claim proceed on a theory of constructive discharge. "To demonstrate a claim for constructive discharge, [a plaintiff] must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 300-01 (6th Cir. 2015) (internal citations omitted); *see also Collete v. Stein-Mart, Inc.*, 126 F. App'x 678, 682 (6th Cir. 2005); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). The intolerable working conditions can take on two different forms: 1) a "work environment even more egregious than the high standard for hostile work environment," or 2) an employer acting "in a manner so as to have communicated to a reasonable employee that she will be terminated." *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014). Ultimately, a constructive discharge claim "requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004) (internal citations omitted). In making this determination, the court looks for the following treatment: "1) demotion; 2) reduction in salary; 3) reduction in job responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a younger supervisor; 6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or 7) offers of early retirement or continued employment under less favorable terms than the former status." *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001).

15

As discussed above, Ms. Smelser's allegations are unable to support even a hostile work environment claim and, therefore, cannot support a claim for constructive discharge, which additionally requires that the environment be even *more* egregious than the already high standard for hostile work environment and that the employer *intended* to create such an environment in order to force the employee to quit. The record is, in fact, devoid of any evidence that Miracle took any actions with the intent of encouraging Ms. Smelser quit. To the contrary, Ms. Smelser concedes that Tim Galvin offered her a raise and tried to persuade her to stay. Further, there is no evidence of any of the factors that might support a finding that Ms. Smelser reasonably believed that termination was imminent or that she reasonably felt compelled to resign. Not only is there no evidence that anyone ever told Ms. Smelser that she would be terminated, it is undisputed that nothing about her salary, benefits, title, or job responsibilities changed for the worse prior to her resignation, aside from the approval of her own request to transfer to a lower position, a transfer which never actually took place.

The only evidence in the record that could in any way be construed as a communication to Ms. Smelser about the uncertainty of her position was the vague comment by Tim Galvin that "other arrangements would have to be made" if Ms. Smelser continued speaking about Ms. Appleton's EEOC charge. Even if Ms. Smelser subjectively interpreted this comment as a threat of termination if she did not resign, that is not evidence that Tim Galvin or Miracle had any intent for her to perceive it that way. Not only is it unclear that this comment was even meant to refer to termination, it is not clear that this comment took place with any temporal proximity to Ms. Smelser's decision to resign. It was, in any event, overshadowed by Tim Galvin's comments that Ms. Smelser was a good employee, his pleading with her to remain at Miracle, and his approval of her request for a raise in the time immediately preceding her resignation.

Ms. Smelser's vague allegation that she subjectively *felt* her job was in jeopardy without any basis in fact – and with the record pointing to the contrary – is not sufficient to show that she was constructively discharged. There is simply no rational, objective basis for a jury to find that a reasonable person in Ms. Smelser's shoes would have felt compelled to resign.

Finally, Ms. Smeler's own admissions undermine any argument that her alleged mistreatment by Tim Galvin or his communications about her job were in any way a causal factor in her decision to resign. She has admitted that her resignation was voluntary and, further, that she would have stayed at Miracle if it were not for Tim Galvin's excluding her from the process of interviewing the new Service Manager, after promising her that she would be included. This event alone, which – as the court has stated above – is nothing more than a workplace disagreement, is not a sufficient basis to find either a hostile work environment or an intentional communication that would make a reasonable person feel they have no choice but to resign. Accordingly, Ms. Smelser has not produced sufficient evidence to support her constructive discharge claim.

Lastly, the court notes that the facts actually demonstrate *two* material changes to the terms of Ms. Smelser's employment – her resignation and, prior to that, her prospective transfer from the position of Service Manager to Service Provider. Ms. Smelser does not, however, advance such a theory of liability. Moreover, the record does not support a constructive demotion claim. First, Ms. Smelser concedes that the request to transfer was voluntary. Further, there are no allegations in the record to suggest that Miracle had any intent to encourage Ms. Smelser to request this transfer, expressly threatened her to do so, or did anything to make her reasonably feel that she had no choice but to make this transfer. As discussed above, there were

17

no adverse changes to the terms of Ms. Smelser's employment between the time she reported Ms. Appleton's allegations and the time she requested to transfer positions.

For these reasons, the court finds that Ms. Smelser's claim for retaliation based on constructive discharge (or any adverse employment action) cannot proceed as a matter of law. The court finds that there is, then, no basis for Ms. Smelser's Title VII claim to proceed, and this action cannot survive summary judgment.

## **CONCLUSION**

For the foregoing reasons, Miracle's Motion for Summary Judgment will be granted and this action will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge